# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| NATASHA L. SMITHERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 4:15-cv-1576-JEO |
| | ) | |
| DECATUR PLASTICS | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

In this action, Natasha L. Smitherman ("Plaintiff") claims that her former

employer, Decatur Plastics Products, Inc. ("Defendant"), discharged her because

of race and in retaliation for complaining about race discrimination, in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §

2000e *et seq.*, and 42 U.S.C. § 1981 ("Section 1981"). (Doc.[1] 1, Complaint). The

cause now comes to be heard on Defendant's motion for summary judgment.

---

[1]References to "Doc(s). __" are to the document numbers of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the Clerk of the Court. Pinpoint citations to deposition testimony are to the page of the reporter's transcript. Unless otherwise noted, pinpoint citations to other documents are to the page of the electronically filed document in the court's CM/ECF system, which may not correspond to pagination on the original "hard copy" presented for filing.

(Doc. 26).  Upon consideration, the court[2] concludes that the motion is due to be granted.

## I.    SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, party is authorized to move for summary judgment on all or part of a claim or defense asserted either by or against the movant.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. PROC. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

---

[2]This action is assigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and this court's general order of reference dated January 2, 2014.  The parties have consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P.  73.  (Doc. 11).

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. PROC. 56(c)(1)(A), (B).  In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.     BACKGROUND[3]

Plaintiff is African-American.  She was hired on August 5, 2013, by Defendant, which manufactures injection-molded plastic products at its plant in Gadsden, Alabama.  Plaintiff started out working on the second shift as an end-of-the-line operator, a Grade II position on Defendant's pay scale.  Her starting pay

---

[3]The facts set forth in this section are gleaned from the evidentiary materials submitted by the parties on Defendant's motion for summary judgment.  (*See* Docs. 30, 31).  In accordance with the applicable standard of review, the court credits Plaintiff's version of events, giving her the benefit of reasonable inferences.  However, Defendant disputes a number of Plaintiff's material allegations, so the facts set forth here are those assumed for purposes of the motion, although they may not be the "actual" facts.

was $7.50 per hour, which included a twenty-five cent shift premium paid to employees on the second shift.

Upon her hire, Plaintiff received a copy of Defendant's policy handbook. (*See* Doc. 30-7 at 8; 30-8 at 3, 6). Included therein is a policy providing that new employees are to receive performance evaluations every three months during the first year of employment, and with each evaluation they are eligible for a pay raise of up to fifty cents per hour. (Doc. 30-16 at 47, Policy 13.0, ¶ C). Generally consistent with that, Plaintiff's supervisor, Marie Varnon, who is white, told Plaintiff early in her employment that she would be receive an evaluation and a pay raise every 90 days for her first year. Accordingly, Plaintiff's first evaluation would have been scheduled for about November 5, 2013, ninety days after she was hired.

A few weeks before that day arrived, however, on or about October 14, 2013, Defendant promoted Plaintiff to a "flocker" position, a more skilled, more physically demanding Grade IV job on Defendant's pay scale. Plaintiff immediately received a fifty-cent raise, bringing her to $8.00 per hour. Because that increase was the result of a promotion, however, Plaintiff did not consider it to have been extended pursuant to Defendant's 90-day review-and-raise policy as she understood it. Rather, she believed she was still due for a performance review

and *another* raise in the first week of November 2013 based on her hire date. In point of fact, though, under Defendant's policies expressed in its handbook, Plaintiff's promotion and raise meant she would not due be for a review, and potentially another raise, until three months from the date of her promotion, *i.e.*, on or about January 14, 2014. (*See* Doc. 30-16 at 48, Policy 13.0, ¶ D ("When you move to a different job through the bidding process ... [y]ou will then be reviewed at 3 months ....")).

In any event, Plaintiff says that as of "latter January of 2014" she had not received a performance review or a further pay increase. (Doc. 31-1, Plaintiff's Declaration ("Pl. Decl.") ¶ 4; *see also* Doc. 30-2, Plaintiff's Deposition ("Pl. Dep.") at 25). That prompted her to ask Varnon why she had been there for going on six months and had still not been given an evaluation. Plaintiff also suggested to Varnon that she was being treated less favorably than another employee on the second shift, Leshie "Le-Le" Parmer. Parmer, who is white, had been hired on November 4, 2013, at which time she became an end-of-the line operator, the same job Plaintiff had before her promotion, starting out, also like Plaintiff, at $7.50 per hour. On this occasion, Plaintiff complained to Varnon that, while she, Plaintiff, had not yet had a performance review, Parmer had been hired after Plaintiff but she said she had already received a review and a fifty-cent-per-hour raise.

5

However, while Plaintiff and Parmer were of different races, something Varnon knew as she supervised them both, Plaintiff acknowledges she did not bring up the issue of race in that conversation. (Doc. 30-2, Plaintiff's Deposition ("Pl. Dep.") at 23-25). In response to Plaintiff's inquiry, Varnon said she would check on why Plaintiff had not received her performance review. The next day, Plaintiff says, Varnon told her she had been evaluated and that, as a result, she was getting a thirty-cent raise, to $8.30 per hour.[4] (*See* Doc. 30-7 at 6). Plaintiff's pay records reveal that increase to have taken effect on January 20, 2014, and that it was first reflected in Plaintiff's paycheck dated January 31, 2014. (Doc. 30-6 at 1).

On April 13, 2014, Plaintiff was given another performance evaluation. She acknowledges receiving a review form and being told at that time that she would be receiving a raise of forty cents, which would have brought her pay to $8.70 per hour. (Pl. Decl. ¶ 5; Doc. 30-7 at 7; Pl. Dep. at 104). However, it is undisputed that such a raise was not implemented in her ensuing paychecks at that time; rather, her actual pay remained at $8.30 per hour. (*See* Doc. 30-6 at 10-14; Doc. 30-7). In early June 2014, Plaintiff went to Varnon and said that she had not

---

[4]The record contains a copy of a performance evaluation form for Plaintiff dated January 14, 2014, stating that she would receive a thirty-cent raise. (Doc. 30-7 at 6). While document purports to bear Plaintiff's signature, Plaintiff testified at her deposition that she had never before seen the document and that her signature was a forgery. (Pl. Dep. at 103-04, 106, 210-11).

received the forty-cent raise promised for her April evaluation. Plaintiff also complained that Parmer had said she had gotten another performance review and another fifty-cent-per-hour raise. Varnon responded by telling Plaintiff that she would contact Karen Cook, Defendant's Human Resources Manager, to find out why Plaintiff had not received her raise from April.

The next day, Plaintiff received a call from Cook on her cell phone. Plaintiff again complained to Cook that, while she had not gotten her raise from her April evaluation, Parmer had told her that she, Parmer, had received two reviews and two raises of fifty-cents each since being hired. Plaintiff concedes that, as with her discussions with Varnon, she did not explicitly link any allegation of disparate treatment to race when speaking with Cook about Parmer, although Cook, who is white, knew that Plaintiff is African-American and that Parmer is white. Cook apologized to Plaintiff that she had not received her raise from April, explaining that, due to a payroll error, her raise had accidentally been applied to the paycheck of a different employee, also named "Natasha," who worked on the first shift. Cook assured Plaintiff that the raise would be on her next paycheck and that she would also be paid what she was owed for the raise going back to her April evaluation.

Plaintiff's received her next paycheck on June 19, 2014, which covered the

workweek from June 9 to 15, 2014. (Doc. 30-4 at 1). As Cook had promised, it showed a forty-cent raise to $8.70 per hour, as well as a lump sum giving Plaintiff the benefit of that raise retroactively for all hours she had worked since her April evaluation. (*Id.*) Nevertheless, Plaintiff remained unsatisfied, believing her "pay was still not right." (Pl. Decl. ¶ 8). That was so because, in her mind, she was still owed an additional raise for the performance evaluation she thought she was due to have received in early November 2013, ninety days following her hire date, but which had not occurred. Upon receiving her paycheck, Plaintiff went to Varnon and the first-shift supervisor, Julian Juarez, and complained that Parmer had received two regular three-month evaluations and two raises that had resulted, Plaintiff thought, in Parmer being paid more than she was despite having been hired later and working an easier job. Frustrated with the situation, Plaintiff quit.

A few hours later, Juarez called Plaintiff and asked her to come back to work on the first shift. Plaintiff agreed, and, on June 21, 2014, she returned to that shift as a flocker. In so doing, Plaintiff was no longer be eligible for the twenty-five-cent-per-hour shift premium paid to employees on the second shift. Thus, her hourly pay was reduced from $8.70 to $8.45.

Soon afterwards, the owner of the plant called a meeting with all the employees working as flockers and "sprayers," including Plaintiff. (Pl. Decl. ¶ 9).

According to Plaintiff, the owner told them that they were all getting a raise of seventy-five cents per hour as of the Fourth of July. (*Id.*; Pl. Dep. at 44-45). At that meeting, Plaintiff saw Cook, who told Plaintiff that she could come see her afterwards if she wanted a further explanation of what was being discussed. Plaintiff took Cook up on that invitation and went to her office. Once there, Plaintiff complained that her "pay was not right" and that Parmer had gotten two raises while she, Plaintiff, had been there longer and gotten only one. Cook told Plaintiff that her supervisor was going to get her another raise soon.

When Plaintiff received her next paycheck, the seventy-five cent raise she thought she was due was not included. (Pl. Decl. ¶ 10). She went to Cook and complained about it. Cook assured Plaintiff that her supervisor would be getting with her during July for an evaluation and a raise. (*Id.*; Pl. Dep. at 48-49). Indeed, under Defendant's three-month review policy, since Plaintiff's most recent review had been on April 13, 2014, her next one was due on or about July 13, 2014.

The last day that Plaintiff worked for Defendant, however, was July 10, 2014. Shortly after eight o'clock that morning, she went on her first break to Cook's office. According to Plaintiff, she asked Cook whether, if she were to go back to her original job as an operator at the end of the line, she would lose the fifty-cent raise she had received with her promotion to flocker in October 2013.

(Pl. Dep. at 50, 52). Cook answered that Plaintiff would "more than likely" lose it. (*Id.* at 52, 57). Plaintiff replied by asking Cook what new hires were being paid, and Cook allegedly told her $8.25 per hour. (*Id.* at 52-53). Plaintiff expressed frustration, stating: "The new hires are making more than me and you're going to drop fifty cents from me if I go to the end of the line. I don't feel that's ... correct and I'm going to call the EEOC and let them figure out what my pay should be." (*Id.* at 55; *see also id.* at 131-33, 142; Doc. 30-16 at 1-30, Deposition of Karen Cook ("Cook Dep.") at 56, 58-59, 70-71, 74). According to Plaintiff, Cook stopped typing on her computer, looked up at Plaintiff and asked, "Who?" (Pl. Dep. at 55). Plaintiff answered, "the Equal Opportunity Commission." (*Id.*) According to Plaintiff, Cook angrily stated, "[I don't] give a fuck who you call[ ]" (Pl. Dep. at 142) and ordered Plaintiff to "get the fuck out." (*Id.* at 131, 132). Plaintiff started to open the door to Cook's office leading back to the manufacturing floor. Cook immediately stopped her, however, and ordered her to leave through a side door to her office that led directly to the parking lot. (*Id.*) At that point, Plaintiff considered her employment to have been terminated.[5]

---

[5]Defendant disputes Plaintiff's account of this meeting with Cook. Indeed, Defendant claims that Plaintiff was not discharged at all but, rather, voluntarily resigned. Specifically, Cook testified that Plaintiff stormed into her office carrying her cell phone and a bag full of her belongings and demanded to know what new hires were making. Cook says that Plaintiff then embarked on an "incoherent rant" (Cook Aff. ¶ 13) that concluded with her loudly declaring, "I'm not going to work here for this pay" (Cook Dep. at 55) and "I'm not going to work this job

## III.    DISCUSSION

### A.    Racially Discriminatory Discharge

Title VII's anti-discrimination provision makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individuals's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Section 1981 grants all persons in the United States "the same right ... to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a); *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 285-96 (1976). For purposes of the statute, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). As such, both § 1981 and Title VII similarly prohibit race discrimination in the formation, termination, and performance of

anymore." (*Id.* at 58). Cook says she took those statements to mean that Plaintiff quit. (*Id.* at 65-66). Cook admits that as Plaintiff was about to leave the office thereafter she said she was going to call the EEOC and a lawyer, but Cook denies that she responded by becoming upset, using profanity, or firing Plaintiff. (*Id.* at 60, 71). Cook also admits she directed Plaintiff to exit her office through a side door leading to outside the building, but she says she did so only because Plaintiff was being so loud that Cook did not want her to cause "disruption" by going back to the manufacturing area. (*Id.* at 56). Of course, the court is bound at summary judgment to credit Plaintiff's version of events, and even Defendant is willing to assume that, if one does so, a trier of fact might reasonably conclude that Plaintiff was fired.

employment contracts.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292

(11th Cir. 2012); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.

1998).  Indeed, both statutes are generally interpreted to impose the same

substantive standards of liability in the employment context such that courts

typically consider the viability of parallel § 1981 and Title VII claims in a single

analysis.  *See Standard, supra; Shields v. Fort James Corp.*, 305 F.3d 1280, 1282

(11th Cir. 2002).  The parties agree that such an approach is proper here, and the

court will proceed accordingly.

Count I of Plaintiff's Complaint asserts that Defendant is liable under Title

VII and § 1981 because Defendant discriminated on the basis of race by

terminating her employment.[6]  As Plaintiff would attempt to prove that claim using

circumstantial evidence of discriminatory intent, the court employs the familiar

burden-shifting framework established by the Supreme Court in *McDonnell

Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v.

Burdine*, 450 U.S. 248 (1981).  *See Flournoy v. CML-GA WB, LLC*, 851 F.3d

1335, 1339 (11th Cir. 2017).  Under that analysis, the plaintiff has the initial

---

[6]The court would observe that while Plaintiff has pled that she *complained* about Parmer being treated more favorably *vis-á-vis* pay and receiving raises, Plaintiff's Complaint conspicuously lacks a claim alleging that Defendant subjected Plaintiff to racially disparate terms of *compensation*.  Rather, the only adverse action Plaintiff has pled as a basis for imposing liability is her *termination*.  (*See* Doc. 1 at Count I (captioned, "TITLE VII - TERMINATION"); *id.* at Count II (captioned, "42 U.S.C. § 1981 - TERMINATION")).

burden to prove a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53.

"Under the *McDonnell Douglas* scheme, 'establishment of the prima facie case in

effect creates a presumption that the employer unlawfully discriminated against

the employee.'" *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)

(quoting *Burdine*, 450 U.S. at 254). This presumption "places upon the defendant

the burden of producing an explanation to rebut the prima facie case- *i.e.*, the

burden of 'producing evidence' that the adverse employment action was taken 'for

a legitimate, nondiscriminatory reason.'" *Id.*, 509 U.S. at 506-07 (quoting *Burdine*,

450 U.S., at 254). Once the defendant produces sufficient evidence to support a

nondiscriminatory explanation for its decision, the plaintiff must be afforded the

"opportunity to prove by a preponderance of the evidence that the legitimate

reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination." *Burdine*, 450 U.S. at 253. "Although intermediate evidentiary

burdens shift back and forth under this framework, '[t]he ultimate burden of

persuading the trier of fact that the defendant intentionally discriminated against

the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (*quoting Burdine*, 450 U.S. at

253).

      Generally speaking, a plaintiff can make out a prima facie case of racially

discriminatory discharge under *McDonnell Douglas* by presenting evidence of the following circumstances: (1) that the plaintiff was qualified for her position, (2) that the plaintiff was terminated, and (3) that the defendant either (a) treated a similarly situated employee of another race, *i.e.*, a "comparator," more favorably or (b) replaced the plaintiff with someone of another race. *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015).

For purposes of summary judgment, Defendant contests only Plaintiff's ability to prove either formulation of the third element above.[7]  For her part, Plaintiff does not dispute she cannot do so.  Rather, while conceding that the facts of her "case do not fit into the usual *prima facie* elements" (Doc. 32 at 23), she maintains that summary judgment is due to be denied on her race discrimination claims on the theory that "'the record presents a convincing mosaic of circumstantial evidence that would allow a jury to find intentional discrimination by the decision maker.'"  (*Id.* (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  The court disagrees.

As Plaintiff suggests, "establishing the elements of the *McDonnell Douglas*

---

[7]As to the litigation more broadly, Defendant insists that Plaintiff was not terminated but, rather, resigned.  *See* footnote 5, *ante*.  However, Defendant is willing to assume for purposes of its motion for summary judgment that the evidence, viewed in the light most favorable to Plaintiff, is sufficient to support her contention that she was fired.

framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith*, 644 F.3d at 1328. Thus, a plaintiff's failure to produce a valid comparator who was treated more favorably or a replacement outside her protected class does not itself necessarily doom the plaintiff's case. *See id.* Rather, the plaintiff will still survive summary judgment if she can point to circumstantial evidence otherwise that, considered collectively and in context, would allow a reasonable inference that race was at least "a motivating factor" in the employer's adverse employment decision. *See id.*; *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227, 1239-40 (11th Cir. 2016); *see also* 42 U.S.C. § 2000e-2(m).

The problem for Plaintiff on her discriminatory discharge claim, however, is not in the putative rigidity of the *McDonnell Douglas* prima facie case. It is, rather, that Plaintiff fails to point to *any* evidence of racially discriminatory intent or animus on the part of the decisionmaker, Cook. Specifically, in addition to the fact that Plaintiff fails to show that an individual of another race replaced her or was retained in similar circumstances, she admits to being unaware of Cook ever making racially discriminatory or offensive statements or saying or doing anything indicating she had treated Plaintiff differently because of race. (Pl. Dep. at 58-59, 65-66). Moreover, while Plaintiff testified in her deposition at one point that she

15

thought that her "being black probably played a role in [her] being terminated" (Pl. Dep. at 67), she failed to cite any specific facts to support such a claim. Indeed, Plaintiff was ultimately equivocal even as to her belief in that proposition, conceding, "Whether [my] being black or not played a role in [my termination], I don't know. It could have, you know, maybe it didn't." (*Id.* at 69; *see also id.* at 67 (when asked what role she believed race played in her being terminated, Plaintiff answered, "I don't know."); *id.* ("I don't know why I was terminated"); *id.* at 61 ("I think I was terminated because I complained to her that I was going to call the EEOC and get my check fixed"). The court concludes, therefore, that Plaintiff's testimony does not support an inference that she was terminated because of race. *See Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("Conclusory allegations without specific supporting facts have no probative value."); *Volunteers of Am., N. Ala., Inc.*, 614 F. App'x 449, 453-54 (11th Cir. 2015) (recognizing that a plaintiff cannot survive summary judgment based "on a self-serving, conclusory statement about why [she] believed she was terminated."); *Satchel v. School Bd. of Hillsborough Cty.*, 251 F. App'x 626, 630 (11th Cir. 2007) (plaintiff failed to establish that alleged harassment she suffered was motivated by race based on her "conclusory statements and beliefs that one of her co-workers was 'a racist' and that the school district was affected by

16

institutional racism" and where she admitted "that she did not know what motivated the harassment from the remainder of her coworkers and that the behavior she observed and experienced did not consist of any racially derogatory statements or acts.").

Despite the foregoing, Plaintiff argues that a jury could infer that race was a motivating factor in Cook's termination decision based on evidence (1) that Plaintiff had complained to both Varnon and Cook on several occasions about Parmer, a white co-employee, being treated more favorably with regard to pay and receiving regular performance reviews and raises and (2) that Cook fired Plaintiff immediately upon her having threatened to contact the EEOC about her pay. (*See* Doc. 32 at 23-24). Such evidence, however, does not tend to show that Plaintiff's termination was motivated by her *race itself*, which is the gravamen of Plaintiff's Title VII and § 1981 claims now under consideration, *i.e.*, those in Count I alleging "race discrimination." Rather, Plaintiff's cited circumstances could at most support only that she was fired for making *complaints related to* race discrimination, which is the crux of a cause of action under Title VII and § 1981 for unlawful "retaliation." *See generally* 42 U.S.C. § 2000e-3(a); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446-52 (2008). Plaintiff has asserted such retaliation claims in Count II of her Complaint, which are addressed in detail

below.  However, "retaliation and discrimination claims are different and have

different elements."  *King,* 614 F. App'x at 454; *see also Sullivan v. National R.R.*

*Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) ("Retaliation is a separate

offense under Title VII; an employee need not prove the underlying claim of

discrimination for the retaliation claim to succeed.").  Specifically, Title VII and §

1981's primary prohibitions against "discrimination" because of race "seek[ ] to

prevent injury to individuals based on who they are, *i.e.*, their status."  *Burlington*

*N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006); *see also University of*

*Tex. Southwestern Med. Ctr. v. Nassar*, ___ U.S. ___, ___, 133 S. Ct. 2517, 2522

(2013).  By contrast, the components of those statutes authorizing a cause of

action for retaliation "seek[ ] to secure [the] primary objective by preventing an

employer from interfering (through retaliation) with an employee's efforts to

secure or advance enforcement of the [statutes'] basic guarantees."  *White*, 648

U.S. at 63. As such, an "antiretaliation provision seeks to prevent harm to

individuals based on what they do, *i.e.*, their conduct."  *Id.; see also Nassar*,

*supra*.  Plaintiff's present argument, though, elides the distinction between

discrimination and retaliation claims, effectively positing that evidence of

"retaliation," *i.e.*, that the decisionmaker acted out of an animus stemming from

protected *activity* is itself evidence of "discrimination" based on *race itself*.  That,

however, is not the law.  Because Plaintiff has failed to point to evidence reasonably indicating that race was at least a motivating factor in Cook's termination decision, Defendant is entitled to summary judgment on Plaintiff's Title VII and § 1981 discrimination claims in Count I.

### B.      Retaliatory Discharge

Title VII's anti-retaliation provision prohibits an employer from discharging or otherwise discriminating against an individual either "[1] because he has opposed any practice made an unlawful employment practice by [the substantive anti-discrimination provisions of Title VII], or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a) (bracketed material added). Section 1981 also authorizes a similar retaliation cause of action in favor of an employee who is terminated for having engaged in protected activity relating to making complaints against unlawful race discrimination.  *See CBOCS West, Inc.*, 553 U.S. 446-52; *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012).

In Count II of her Complaint, Plaintiff contends that her discharge violated the anti-retaliation components of both Title VII and § 1981.  In particular, she claims Defendant fired her because she made a threat to Cook that she would

contact the EEOC about her pay and because she complained to Cook and Varnon

about her pay and about more favorable treatment allegedly afforded to a white co-

employee, Parmer, in relation to pay and raises. The parties again agree that such

claims arising under Title VII and § 1981 are subject to a unified analysis at

summary judgment.

### 1. Simultaneous Pursuit of Claims Alleging Race Discrimination and Unlawful Retaliation

As a threshold matter, however, Defendant maintains that summary

judgment is warranted on Plaintiff's retaliation claims on the theory that her

continuing pursuit of a claim that she was fired because of her race precludes her

from attempting to establish that she was fired, additionally or alternatively,

because she engaged in statutorily protected activity based on her complaints.

This argument relies on the fact that Title VII retaliation claims are subject to a

"but-for" standard of causation, which "requires the plaintiff to show 'that the

harm would not have occurred' in the absence of--that is, but for--the defendant's

conduct." *Nassar*, 133 S. Ct. at 2525, 2533. In that way, Title VII retaliation

claims are distinguishable from Title VII claims alleging discrimination proper,

upon which a plaintiff may establish liability by showing that race was merely "a

motivating factor" in the employer's decision to take an adverse employment

action. *See* 42 U.S.C. § 2000e-2(m); *Nassar*, 133 S. Ct. 2522-23. Defendant takes the position that Plaintiff's assertion that she was discharged because of her *race* "negates" her ability to establish that animus arising from her *complaints* was the "but-for" cause of Defendant's decision to fire her. (Doc. 29 at 16-17). The court disagrees.

Defendant's instant argument is founded upon *Jones v. Allstate Ins. Co.*, 2016 WL 4259753, at *3 (N.D. Ala. Aug. 12, 2016), *appeal pending*, No. 16-15628 (11th Cir.), and *Thomas v. Kamtek, Inc.*, 143 F. Supp. 3d 1179, 1186 (N.D. Ala. 2015)). (*See* Doc. 29 at 17-18). Both of those cases were decided by one member of this court, United States District Judge William M. Acker, Jr., and each traces its roots to *Culver v. Birmingham Bd. of Educ.*, 646 F. Supp. 2d 1270 (N.D. Ala. 2009), another decision by him. In short, Judge Acker has staked out the position that if a plaintiff asserts a discrimination or retaliation claim that is subject to a "but-for" causation standard, that forecloses the plaintiff from simultaneously pursuing any other discrimination or retaliation claim alleging a different motivation for the same adverse action, based on an assumption that there can be only a single "but-for" cause of an employment decision. *See Culver*, 646 F. Supp. 2d 1271-72; *Jones, Thomas, supra*; *see also Gwin v. BFI Waste Services, LLC*, 718 F. Supp. 2d 1326 (N.D. Ala. 2010); *Hendon v. Kamtek, Inc.*,

117 F. Supp. 3d 1325, 1330-35 (N.D. Ala. 2015); *Savage v. Secure First Credit Union*, 107 F. Supp. 3d 1212, 1215 (N.D. Ala. 2015); *Montgomery v. Board of Trustees of the Univ. of Ala.*, 2015 WL 1893471, at *5 (N.D. Ala. Apr. 27, 2015); *Dawson v. Wal-Mart Stores East, LP*, 160 F. Supp. 3d 1303, 1304-05 (N.D. Ala. 2016).

Prior district court decisions, including those by other members of this court, however, are not binding here. *See Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2011); *Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991). Indeed, the undersigned is firmly on record as having disagreed with Judge Acker's conception that a "but for" causation requirement on one claim precludes a plaintiff from also pursuing claims alleging a different unlawful motive. *See Stokes v. Security Eng'r's, Inc.*, 2017 WL 769902, at *7 n. 6 (N.D. Ala. Feb. 28, 2017); *Howell v. Morrison Mgmt. Specialists, Inc.*, 2013 WL 6568935, at *5-6 (N.D. Ala. Dec. 13, 2013). Further, a panel of the Eleventh Circuit concluded last year that Judge Acker's approach is wrong, at least insofar he was requiring plaintiffs to elect at the pleading stage between claims alleging different theories of motivation. *See Savage v. Secure First Credit Union*, 2016 WL 2997171, at *1 (11th Cir. May 25, 2016). While that appellate opinion in *Savage* is unpublished and thus also non-binding, *see* 11th Cir. R. 36-2, it obviously can do nothing but

tend to support the views previously expressed in *Howell* and *Stokes*. *See also Morgan v. County Comm'n of Lawrence Cty.*, 2016 WL 3525357, at \*2 (N.D. Ala. June 20, 2016) (Smith, J.) (taking the Eleventh Circuit's opinion in *Savage* "as a clear warning of reversible error" and thus allowing the plaintiff to reinstate claims alleging age discrimination notwithstanding her continued pursuit of claims alleging discrimination because of sex, disability, and retaliation).

Defendant emphasizes that the Eleventh Circuit's opinion in *Savage* does not address whether a plaintiff is permitted to pursue multiple theories at summary judgment. (Doc. 33 at 10-11). Judge Acker also highlighted that distinction in *Jones*, *supra*, in holding that a plaintiff may not do so. *See* 2016 WL 4259753, at \*1. However, both *Howell* and *Stokes* both rejected Judge Acker's approach at the summary judgment stage, essentially concluding that, while a plaintiff may *recover* only once for a given adverse action, she may assert different prohibited motives for it, and that the court is to analyze each claim independently under the applicable causation standard to assess whether sufficient evidence supports that the associated prohibited animus motivated the employer. *See Howell*, 2013 WL 6568935, at \*5-6; *Stokes*, 2017 WL 769902, at \*7 n. 6. *See also Putman v. Sterilite Corp.*, No. 2:10-1054-PWG, Doc. 34 at 10-13 (N.D. Ala. Oct. 31, 2011) (Greene, M.J.), *report and recommendation adopted*, *id.*, Docs. 35, 36 (N.D. Ala.

February 7, 2012) (Blackburn, C.J.). Nothing argued by Defendant now, nor by Judge Acker in *Jones*, convinces the undersigned to retreat from *Howell* and *Stokes*. Therefore, Defendant is not entitled to summary judgment on Plaintiff's retaliatory discharge claims on the basis that Plaintiff has also continued to claim that her termination was motivated by her race.

## 2. The Merits

To establish a *prima facie* case of retaliatory discharge, Plaintiff would have the burden at trial to prove the following elements: (1) that she engaged in statutorily protected activity; (2) that she was terminated; and (3) that there is a causal connection between her protected activity and her termination. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008). In support of its motion for summary judgment, Defendant targets only Plaintiff's ability to present sufficient evidence that she engaged in protected activity.[8]

It is undisputed that Plaintiff made multiple verbal complaints to Varnon and Cook about her pay, including a perceived failure to be given timely performance evaluations and raises. It is well established that, in the context of

---

[8]Again, while Defendant maintains that Plaintiff voluntarily resigned, Defendant has assumed for purposes of summary judgment that the evidence, viewed in the light most favorable to Plaintiff, could support a finding that she was fired. *See* footnote 5, *ante*.

retaliation claims, "Title VII's protections are not limited to individuals who file formal complaints, but extend to those who voice informal complaints as well." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (citing *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989)). Defendant argues, however, that Plaintiff's complaints are not protected activity because she did not convey that she was complaining about activity made unlawful under Title VII. In particular, Defendant insists that Plaintiff did not claim that she had been mistreated because of her *race*.

The court agrees that Plaintiff's complaints might be protected against retaliation only if she "explicitly or implicitly communicate[d] a belief," *Furcron*, 843 F.3d at 1311, that purported mistreatment was because of race. That is so because mere disagreement with the employer's decision or complaints that the employer has been unfair only in some general sense don't qualify as protected activity. *See Quigg*, 814 F.3d at 1244-45; *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir.1995); *Livingston v. Marion Bank & Tr. Co.*, 30 F. Supp. 3d 1285, 1314 (N.D. Ala. 2014); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011) (to qualify as protected activity for purposes of a retaliation claim under the Fair Labor Standards Act ("FLSA"), an employee's "complaint must be sufficiently clear and detailed for a reasonable

25

employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and call for their protection."). And to that end, it is undisputed that, although Plaintiff says she subjectively believed that she was discriminated against because of race with regard to her pay and receiving timely pay raises based on her perception that Parmer was being treated better (Pl. Dep. at 61-62, 144), Plaintiff never explicitly mentioned race or even generic "discrimination" in any of her complaints.

Plaintiff responds that her complaints were nevertheless protected because they *implicitly* communicated a belief that she was being mistreated because of race. First, she points out that she complained to both Varnon and Cook while referencing a belief that Defendant had afforded more favorable treatment regarding pay and raises to Parmer, whom both Varnon and Cook knew to be white. Second, Plaintiff emphasizes that, on her last day of work, she again complained about her pay and threatened to contact the EEOC, which Plaintiff claims prompted Cook to fire her on the spot.

But as to the first point, again, even when Plaintiff made complaints referencing Parmer, she never said anything about race. Rather, Plaintiff said her problem was with Parmer having been treated better despite (1) having worked at the plant a shorter length of time and (2) doing an easier job. Such complaints

reasonably suggest Plaintiff believed Defendant was treating her unfairly.  But the court agrees with Defendant that the fact that Parmer was of a different race than Plaintiff, although known to the decisionmaker, was insufficient to put Defendant on notice that Plaintiff's complaints were intended as opposition to discrimination because of race.  *See Stucke v. City of Philadelphia*, 685 F. App'x 150,  2017 WL 1363874, at *4 (3d Cir. Apr. 12, 2017) (although plaintiff threatened generally to sue and complained to the employer without mentioning race that he was upset that a desired position had gone to another candidate who lacked a degree, such was not protected activity under Title VII despite the fact that successful candidate was of a different race than plaintiff); *Steele v. Kroenke Sports Enterprises, LLC*, 264 F. App'x 735, 745-46 (10th Cir. 2008) (where female plaintiff complained that employer had been "unfair" to award sought position to another candidate but did not mention age or gender, her complaint was not protected under either Title VII or the Age Discrimination in Employment Act even though successful candidate was male and younger); *see also Cole v. Board of Trustees of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016) (plaintiff's complaint was not protected opposition where it did not mention race, notwithstanding that plaintiff "was the only African-American foreman or sub-foreman in [his] department"); *Merke v. Lockheed Martin*, 645 F. App'x 120, 124-25 (3d Cir. 2016) (holding that, where

black plaintiff's internal complaints of mistreatment did not reference race, the fact that "other members of his team were almost exclusively white" was insufficient to raise an inference that he was opposing discrimination because of race). Accordingly, the court concludes that Plaintiff's references to Parmer were not sufficient to render those complaints protected under Title VII or § 1981.

Plaintiff emphasizes, however, that she also told Cook immediately before being fired that she was going to call the EEOC about her pay. An employee's threat to contact the EEOC certainly may be protected activity under Title VII. *Jeffries v. Harris Cty. Community Action Ass'n*, 615 F.2d 1025, 1035-36 (5th Cir. 1980)[9]; *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163-64 (11th Cir. 1993). Moreover, given the EEOC's prominent role in enforcing Title VII and similar federal anti-discrimination laws, even if an employee's accompanying complaint to the employer does not expressly mention a federally-protected characteristic, like race, sex, or age, it may be a reasonable inference that an employee's expressed intention to invoke the assistance of the "EEOC" or the "EEO" conveys a belief that the employer has discriminated on a legally prohibited basis. *See Morales v. Merit Systems Protection Bd.*, 932 F.2d 800, 901

---

[9]The decisions of the former Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

(9th Cir. 1991) (employee engaged in protected activity where he threatened to file an "EEO lawsuit," with no reference to age or race discrimination and complained to his supervisor that "people with less education and less experience than he were being promoted before he was"); *Mason v. Transportation Solutions*, 2010 WL 2698308, at *10 (W.D. Pa. July 7, 2010) (holding that the plaintiff's complaint letter to her employer was protected activity even though it did not specifically mention age or gender where it concluded by asking for an appropriate remedy for harassment and threatening that if the plaintiff was "not satisfied with the remedy [defendant] put[s] forward [she would submit her case] to the EEOC."). Indeed, "despite defendant's argument that plaintiff was not actually alleging [race] discrimination, it is difficult to understand why [an employee] would threaten to go to the EEOC unless she believed she was the victim of unlawful discrimination." *Mason*, 2010 WL 2698308, at *10. As such, the court will assume that Plaintiff's threat to contact the EEOC sufficiently put Cook on notice that Plaintiff was then opposing discrimination based on race, particularly given that (1) Cook admits to being familiar with what the EEOC is and does and (2) Plaintiff had made earlier complaints to Cook citing more favorable treatment regarding pay being given to Parmer, whom Cook knew to be white.

However, Defendant further argues that, even if Plaintiff's threat to contact

the EEOC provided fair notice that she was opposing race discrimination, it still

doesn't qualify as protected activity unless it was also founded upon an

objectively reasonable belief that she is opposing employer conduct that violates

Title VII. The Eleventh Circuit has explained that, for informal complaints to be

protected under Title VII,

> a plaintiff is required to show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). This burden includes both a subjective and an objective component. *Id.* That is, the plaintiff must not only show that she subjectively (*i.e.*, in good faith) believed the defendant was engaged in unlawful employment practices, but also that her "belief was objectively reasonable in light of the facts and record present." *Id.* (emphasis in original); *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010). The objective reasonableness of her belief is measured by reference to controlling substantive law. *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008). Even so, the plaintiff is not required to prove that the discriminatory conduct complained of was actually unlawful. *Little*, 103 F.3d at 960. The conduct opposed need only "be close enough to support an objectively reasonable belief that it is." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).

*Furcron*, 843 F.3d at 1311. Further, an employee's belief may be reasonable, and

thus protected, "even if the employee turns out to be mistaken as to the facts."

*Payne v. McLemore Wholesale & Retail Stores*, 654 F.2d 1130, 1138 (5th Cir.

Unit A Sept. 4, 1981) (quoting *Hearth v. Metropolitan Transit Comm'n*, 436 F.

Supp. 685, 689 (D. Minn. 1977)). Thus, the objective reasonableness of a

plaintiff's belief that she was opposing unlawful discrimination is judged in light of the "totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint." *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 647 (6th Cir. 2015); *see also Wesolowski v. Napolitano*, 2013 WL 1286207, at *5 (S.D. Ga. Mar. 25, 2013) ("[E]ven if plaintiff's opposition was based on a mistake of law or fact, he still can succeed on an opposition clause claim." (citing *Parker v. Baltimore & O.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981)).

Courts have recognized the applicability of the "reasonable belief" requirement to threats to contact the EEOC. *See Robbins v. District of Columbia*, 650 F. App'x 37, 40 (D.C. Cir. 2016); *Mann v. Hutchinson Public Schools*, 202 F.3d 282 (table), 1999 WL 1092594, at *3 (10th Cir. 1999); *McDonald v. NYK Logistics (Americas), Inc.*, 2011 WL 197578, at *12 (W.D. Tenn. Jan. 19, 2011), *aff'd*, 485 F. App'x 764 (6th Cir. 2012). Indeed, Plaintiff does not dispute that the requirement applies to all of her complaints at issue. Rather, Plaintiff argues that she meets the standard.

When Plaintiff told Cook she was going to call the EEOC, she had just been complaining, broadly speaking, about her pay. And there is no doubt that Title VII prohibits pay discrimination. *See* 42 U.S.C. § 2000e-2(a) (prohibiting

31

discrimination "with respect to ... compensation"); *Bazemore v. Friday*, 478 U.S. 385, 395 (1986) ("Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII"). However, according to Plaintiff herself, what she was complaining about in that final meeting, on its face, did not concern what she was then being paid or whether she was overdue for a raise. Nor did she mention Parmer. Instead, Plaintiff's threat was prompted specifically by Cook's answer, in response to Plaintiff's inquiry, that, if Plaintiff were to go back to her former position as an end-of-the-line operator, she would "more than likely" lose a fifty-cent raise she had received upon being promoted from that same job some nine months earlier. There is no evidence, however, that there was any offer or plan by Defendant to move Plaintiff back to the end of the line, even if she wanted to. Nor does Plaintiff's testimony indicate that Cook's informal, off-the-cuff response to Plaintiff's question actually represented something approaching a determination or pending proposal by Defendant to actually cut Plaintiff's pay by fifty cents an hour, irrespective of whether the transfer idea Plaintiff was floating might ever come to fruition. Rather, Cook merely offered what she *thought* Defendant was "*likely*" to do *if* Plaintiff were in the future to request a transfer back to her old job and *if* such a request were to be granted by Defendant. "As the law stands, Title VII does not

create a claim for every employee who complains about the potential for Title VII violations." *Robinson v. Cavalry Portfolio Servs., LLC*, 365 F. App'x 104, 112 (10th Cir. 2010). Rather, "an employee seeking protection from retaliation must have an objectively reasonable belief that a Title VII violation *has happened* or is *already in progress*, not that a hypothetical, future violation may occur." *Dorsey v. Fulton Cty.*, 2012 WL 3871921, at *12 (N.D. Ga. Aug. 1, 2012) (emphasis original), *report and recommendation adopted sub nom. Dorsey v. Fulton Cty. Pub. Works Dep't*, 2012 WL 3871919 (N.D. Ga. Sept. 5, 2012). Plaintiff simply could not have had an objectively reasonable belief that Cook's informal, tentative answer to her hypothetical question evidenced any past, ongoing, imminent or planned Title VII violation on the part of Defendant. On top of that, Plaintiff also fails to point to evidence sufficient to show that it might have been objectively reasonable for her to think that Cook's acknowledgment that Plaintiff would "more than likely" lose pay if she were to voluntarily seek and accept what would have undisputedly been a *demotion* demonstrated an intent to unlawfully discriminate.

Plaintiff responds by arguing that "Cook should have known that [Plaintiff]'s question [about what would happen to her pay if she were to go back to the end of the line] was related to her earlier complaints about Parmer working

in the easier job and getting her raises on schedule." (Doc. 32 at 18). However, Plaintiff points to no evidence supporting that Cook actually viewed her final meeting with Plaintiff that way. And to the extent that Plaintiff is suggesting that a reasonable person in Cook's position would have understood Plaintiff's threat to go to the EEOC as also being based on all of her earlier complaints that referred to more favorable treatment to Parmer, the court disagrees. Again, in that final meeting with Cook, it is undisputed that Plaintiff said nothing about Parmer. She did not complain at all about what she was then being paid, either in absolute terms or in relation to anyone else. Nor did she say anything about raises. Rather, Plaintiff said she was going to call the EEOC after telling Cook that she thought it was unfair if she were to lose fifty cents in pay if she were to transfer back to the end of the line. As such, it is not reasonable to charge Cook with knowledge that Plaintiff's complaints in that meeting were opposing Defendant's alleged disparate treatment of Plaintiff and Parmer regarding their wages and raises.

But even assuming it were otherwise, Plaintiff could not have had an objectively reasonable belief when she threatened to contact the EEOC that Defendant had unlawfully discriminated against her in relation to her compensation based on how Defendant had treated Parmer. First, Plaintiff could not have reasonably believed that Defendant had treated Parmer more favorably

because of race with regard to the timing of raises. At the heart of Plaintiff's complaints on that front lies Plaintiff's belief that, under Defendant's general review-and-raise policy, she was entitled to a raise 90 days following her hire date, which would have been in early November 2013, and then every 90 days thereafter for the first year of her employment. Plaintiff undisputedly did not receive a raise that November and she certainly appeared to think that Parmer was treated better because she did receive her first raise about three months into her employment. But, *unlike* Parmer, Plaintiff was *promoted* and had received an accompanying fifty-cent raise several weeks *before* her first scheduled three-month review, when she became a flocker in mid-October 2013. Pursuant to the policies set forth in Defendant's handbook, that promotion effectively reset Plaintiff's review-and-raise clock, making her next evaluation and potential raise due three months from the date of the promotion. Given that Plaintiff received a copy of the handbook, she could have discerned that to be so in the exercise of reasonable diligence. But even setting Plaintiff's knowledge of the handbook aside, the fact remains that what Plaintiff thought she was entitled to was not one but *two* raises by the 90th day of her employment, despite having no basis for reasonably believing that Defendant had extended such largesse to Parmer or anyone else.

Plaintiff also referenced Parmer having recently received her second timely

35

review and raise when Plaintiff complained to Varnon and then Cook on consecutive days in early June 2014. At that time, Plaintiff said she was upset about not having received a forty-cent raise that had been promised to her on her evaluation the preceding April, which was to have been Plaintiff third raise since her hire. As discussed previously, at the time Plaintiff actually made those complaints in early June, she failed to convey that she might have been talking about disparate treatment because of race. And by the time she threatened to call the EEOC in Cook's office on July 10, 2014, she clearly had no reasonable basis for thinking that she had been mistreated because of race in connection with the "missing" raise from April. In particular, it is undisputed that when Plaintiff complained, Cook responded immediately and explained that the raise from April had accidentally been applied to the paycheck of another employee named "Natasha," and Cook assured Plaintiff she would rectify the error. In turn, Plaintiff's next paycheck undisputedly included the raise and a lump sum giving her its benefit retroactively to the date of her April review. After that, as now, Plaintiff had no reasonable cause to suspect that Defendant's failure to apply the raise initially was anything other than a good-faith mistake, as Cook had explained.

Finally, Plaintiff also had no reasonable basis for believing when she

threatened to call the EEOC that she was a victim of racially disparate pay in relation to Parmer. On that score, the court would acknowledge at the outset that Plaintiff appears to have been mistaken about how much Parmer was actually making. In particular, Plaintiff says Parmer had told her she had received two raises of fifty cents each, one in about late January 2014 and another around early June 2014. Defendant has presented evidence showing, however, that, while Parmer did receive a fifty-cent raise, taking her to $8.00 per hour, with her first evaluation, that was not until February 3, 2013. (*See* Doc. 30-1, Affidavit of Karen Cook ("Cook Aff.") at 6-7, ¶ 18; Doc. 30-16 at 33-34, ¶ 2)). Defendant also claims that, regardless of what Parmer may have told Plaintiff, Parmer did not, in fact, receive another fifty-cent raise while she and Plaintiff both worked for Defendant. Rather, Defendant's evidence indicates that Parmer had her second three-month performance evaluation on May 19, 2014, at which time she received a raise of only thirty cents, not fifty, which then put Parmer at $8.30 per hour. (Doc. 30-16 at 34, ¶ 2).

As to the above, Plaintiff's testimony related to what Parmer said about her reviews and raises is hearsay if offered to prove that Parmer did, in fact, receive certain raises or when. *See Brown v. Metropolitan Atlanta Rapid Transit Auth.*, 261 F. App'x 167, 174 & n. 9 (11th Cir. 2008); *see also generally Macuba v.*

*Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment."). However, Plaintiff's testimony is admissible to show her knowledge and state of mind when she made her complaints. *See id.* Furthermore, even if Parmer's alleged statements regarding her own pay and raises were not entirely true, it does not appear that Plaintiff had any particular reason to doubt them. Therefore, the court will assume that a jury could find that Plaintiff would have been reasonable in taking Parmer's statements to her at face value.

Nevertheless, by the time that Plaintiff threatened to call the EEOC in July, Plaintiff knew that her most recent pay raise from April had resulted in her being paid $8.70 per hour, which included a 25-cent premium for working on the second shift. At that time, Parmer was, in fact, making only $8.30 per hour, which also included the same second-shift premium. However, it is assumed that Plaintiff might have reasonably thought Parmer was making about $8.50 per hour. That would be based on Parmer's having told Plaintiff she had received two separate fifty-cent raises since being hired, coupled with an assumption that Parmer's initial salary as an end-of-the-line operator had been the same as Plaintiff's own in that job, $7.50 per hour, which, in fact, it was. But even if such a belief were justified, Plaintiff still could not have reasonably believed that Parmer was making more

than she was when they both worked together on the second shift.  And to make out a prima facie case of disparate pay under Title VII using circumstantial evidence, a plaintiff has the burden to present proof that she performs a job similar to that of another, higher paid employee from outside her protected class.  *See Cooper v. Southern Co.*, 390 F.3d 695, 734-35 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods*, Inc., 546 U.S. 454, 457 (2006); *Walker v. Fulton Cty. Sch. Dist.*, 624 F. App'x 683, 687-88 (11th Cir. 2015).  Admittedly, after Plaintiff quit her employment on June 19, 2014, she agreed to return to work two days later as a flocker on the first shift, which meant she was no longer eligible for the shift premium.  Her pay was thus reduced to $8.45 per hour.  But even if Plaintiff might have been reasonably justified in believing that Parmer was then making about a nickel more per hour than she was, Plaintiff admits she does not consider her move to the first shift or her accompanying loss of the shift differential to have been anything other than a legitimate application of Defendant's established policies.  Therefore, Plaintiff could not have had an objectively reasonable belief at the time she threatened to contact the EEOC that Defendant had subjected her to racially disparate pay relative to Parmer.

Based on the foregoing, the court concludes that Plaintiff cannot establish that she engaged in protected activity, as required to make out a prima facie case

of retaliatory discharge under Title VII and § 1981. Therefore, Defendant is entitled to summary judgment on those claims.

IV.     **CONCLUSION**

Defendant's motion for summary judgment (Doc. 26) is due to be

**GRANTED**. A separate final order will be entered.

**DONE**, this 24th day of August, 2017.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge